IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA,
the STATE OF FLORIDA,
ex. rel., ROBERT WATINE, M.D.,

    Plaintiffs,

v.                                    Case No. 1:09cv137-SPM-GRJ

CYPRESS HEALTH SYSTEMS
FLORIDA, INC., and ALAN BIRD,

    Defendants.
_____/

**ORDER GRANTING IN PART AND DENYING IN PART**
**THE MOTION TO DISMISS THE AMENDED COMPLAINT**

THIS CAUSE comes before the Court on Defendant Cypress Health Systems Florida, Inc.'s Motion to Dismiss Amended Complaint (doc. 99). Defendant Alan Bird adopted the motion (see doc. 106) and Plaintiff filed a response in opposition (doc. 108). For the following reasons, the motion to dismiss the amended complaint will be granted in part and denied in part.

**I. BACKGROUND**

**A. False Claims Act**

Plaintiff Robert Watine, M.D., brings this suit on behalf of the United States and the State of Florida pursuant to the provisions of the federal False

Claims Act, 31 U.S.C. §§ 3729-32, and the Florida False Claims Act, Fla. Stat. §§ 68.081-086.  Because the Florida False Claims Act is modeled after the Federal False Claims Act, the claims will be  be analyzed using the same general standards.  See United States ex rel. Heater v. Holy Cross Hosp., Inc., 510 F.Supp.2d 1027, 1034 n.5 (S.D. Fla. 2007).

Defendant Cypress Health Systems Florida, Inc. ("Cypress Florida") owns and operates a 40-bed acute care for-profit hospital, known as Nature Coast Regional Hospital, in Williston, Florida.   Plaintiff worked at Cypress Florida for a two month period from March 2008 until April 2008.  He  alleges that Cypress Florida and its administrator, Defendant Alan Bird, engaged in acts, schemes, and billing practices with the aim and result of defrauding government healthcare programs of over $25 million in false claims.  If successful, Plaintiff is entitled to receive a percentage of the government's recovery.  Plaintiff's allegations of fall into three categories: (1) fraudulent "upcoding," (2) fraudulent reporting of a patient's place of service, and (3) fraudulent "churning" by splitting into multiple visits a patient's appearance for diagnosis, testing, treatment, and medication.

**B.  Medicare Reimbursement**

Medicare establishes a system through which hospitals obtain reimbursement for services they provide to Medicare beneficiaries.  To obtain reimbursement, hospitals submit claims of payment to Medicare.  These claims are based on discharge summaries prepared when the Medicare beneficiary and

hospital patient is discharged from the hospital's service.  Medicare pays the hospital a pre-determined amount based on the Diagnosis Related Group (DRG) code assigned to each patient.  Some DRG codes pay a significantly higher amount than others.  Further, where the patient was seen (i.e. the patient's "place of service") and the number of visits will also result in different reimbursement amounts.

Throughout his employment with Cypress Florida, Plaintiff alleges that the physicians who worked there were instructed to bill the highest paying DRG codes for the purpose of receiving the highest amount of reimbursement.  As an incentive, the physicians who reported these higher paying but false DRG codes would receive higher bonuses.  Plaintiff alleges that the administrative personnel of Cypress Florida posted the highest paying DRG codes for the employees to see and told employees to bill more of these codes.  Plaintiff alleges that he was even directly remonstrated by the hospital administrator Alan Bird for failing to follow the fraudulent scheme.

Despite the instructions Plaintiff received, Plaintiff was not convinced that fraudulent billing was actually occurring until the hospital administration asked him to review twenty-five Explanation of Benefits or Medicare Summary Notices (EOBs) and then write a letter to the medicare intermediary appealing the denial of claims.  Throughout this process of review, Plaintiff alleges that he was unable to write a single letter appealing the denial of claims because all of the DRG

codes submitted were incorrect.

Plaintiff, on his own initiative, randomly pulled sixteen patient history charts, reflecting a seven year period.  These charts, which Plaintiff alleged used DRG codes that were false but higher paying than the code that should have been used, had been submitted to Medicare, or another government healthcare program, for reimbursement.

Further, Plaintiff alleges that he was encouraged to see patients at the Williston Rehabilitation & Nursing Center, LLC several days a week.  Plaintiff made these visits weekly.  However, Plaintiff alleges that because reimbursements for seeing patients at the hospital's out-patient clinic were higher than reimbursements for seeing patients at the nursing home, Cypress Florida billed these nursing home patient visits as if the patient was seen at the out-patient clinic.  Plaintiff alleges that of the 125 patients that he and another physician saw at the nursing home, all 125 were billed as having been seen at the out-patient clinic.  Moreover, when Plaintiff asked the administrator Alan Bird why his nursing home visits weren't reflected in his physician compensation sheet, Bird replied that the visits were incorporated into the out-patient clinic visits.

Finally, Plaintiff alleges that he was constantly berated and admonished for not adhering to the Cypress Florida business plan of fraudulently churning patient visits.  Because Medicare would pay a higher reimbursement amount for

each office visit a patient made, the business plan was to separate patient diagnosis, testing, surgery, treatment and medication into separate office visits to maximize out-patient clinic revenue. Plaintiff alleges that administrator Alan Bird explained to him the eight step plan for how to conduct this churning.

### C. Challenges to Complaint

On July 12, 2011, the Court dismissed Plaintiff's complaint with leave to amend based on Plaintiff's failure to meet the heightened pleading standard for fraud under Federal Rule of Civil Procedure 9(b). Cypress Florida challenges the amended complaint based on many of the same deficiencies noted in the prior complaints. Cypress Florida includes a new challenge, arguing that it should not be held liable for fraud that occurred before September 15, 2010 when 100% of the stock of Cypress Florida was sold to new owners.

## II. DISCUSSION

### A. Heightened Pleading Standard

The Federal Rules of Civil Procedure require that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This heightened pleading standard applies to actions brought pursuant to the False Claims Act. <u>United States ex rel. Clausen v. Lab. Corp. of Am.</u>, 290 F.3d 1301, 1308-09 (11th Cir. 2002). "[A]pplication of the rule . . . serves an important purpose: it prevents relators from filing suit based on a mere hunch and using discovery in the hope of finding support for the

claim." United States of America ex rel. Brodsky v. Capital Group Health Services of Fla., Inc., 4:02cv389-RH/WCS, 2005 WL 1364619 at *7 (N.D. Fla. June 7, 2005).

To meet the standard of pleading with particularity, the "plaintiff must plead facts as to time, place and substance of the defendant's alleged fraud . . . ." United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1357 (11th Cir. 2006) (internal citations omitted). This means pleading the "details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them." Id. (internal citations omitted); United States ex rel. Cooper v. Blue Cross & Blue Shield of Fla., 19 F.3d 562, 567 (11th Cir. 1994).

Merely pleading false practices or fraudulent schemes alone is insufficient to state a claim pursuant to the False Claims Act. United States ex rel. Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1328 (11th Cir. 2009). Rather, a plaintiff must show that the government paid, or that the defendant submitted to the government to be paid, a false claim. Id. The submission of a false claim is the "sine qua non of a False Claims Act violation." Clausen, 290 F.3d at 1311.

**B.  Upcoding**

Plaintiff's claims concerning fraudulent "upcoding" stem from allegations that he overheard conversations concerning the fraudulent billing practice, he was exhorted by a superior telling him to bill higher DRG codes, he was asked to review twenty five EOBs that contained false DRG codes, and he performed his

own random survey of sixteen patient charts which used false DRG codes.

With regard to the twenty-five EOBs that Plaintiff reviewed, Plaintiff makes general comments concerning their accuracy.  As to a select few, he gives specific reasons for the errors but he does not provide any details about their allegedly false submission to a government healthcare program.  The EOBs were not attached to Plaintiff's amended complaint and Plaintiff has failed to allege the amount of the claims, who submitted the claims, and when the claims were submitted.  Although in Plaintiff's review of the EOBs he allegedly could find no support for the use of the higher paying DRG codes, by failing to allege the details of how these EOB claims were actually submitted, Plaintiff has failed to meet the heightened pleading standard.

Plaintiff has failed to include the "details of the defendant's allegedly fraudulent acts, when they occurred, and who engaged in them."  Atkins, 470 F.3d at 1357 (internal citations omitted).  Furthermore, since Plaintiff's claim in Count II of his amended complaint is under subsection (a)(2) of Title 31, United States Code, Section 3729, he must show that the government actually paid the false claims.  Hopper, 588 F.3d at 1327.  But the twenty-five EOBs were denied payment and there is no indication that Plaintiff or anyone else wrote a letter to the medicare intermediary to successfully appeal the denial.  Given the lack of specifics concerning when these claims were submitted and by whom, and whether they were paid, Plaintiff's allegations regarding the twenty-five EOBs are

insufficient to meet the heightened pleading standard.

With regard to the sixteen patient charts, Plaintiff alleges that improper DRG codes were used when diagnosing the patients.  For chart numbers 2, 5, 6, and 7, Plaintiff provides specific dates and amounts of the claims submitted and paid.  For the other charts, Plaintiff alleges generally that the claims were presented for payment within seven days of the patients' discharge by either Cypress Florida's Chief Financial Officer (Sue, last name unknown) or Karla Dass, who was the executive assistant to Alan Bird.

The allegations are sufficient to meet Rule 9(b)'s heightened pleading standard as to Count I of the amended complaint, which alleges false presentment of claims under subsection (a)(1) of Title 31, United States Code, Section 3729.  See Hopper, 588 F.3d at 1327 (explaining that the central focus of a claim under (a)(1) is false presentment).  Plaintiff has pleaded false presentment with particularity by alleging when the false claims were presented and by whom.

As to Count II, which alleges false payment under subsection (a)(2), Plaintiff provides allegations about payment only for charts 2, 5, 6, and 7.  Since actual payment of the claim by the government is required for a valid claim under subsection (a)(2), only charts 2, 5, 6, and 7 are adequately pleaded.  Id.  The other charts lack allegations about payment, let alone allegations pleaded with particularity to meet the requirements of Rule 9(b).

Case No. 1:09cv137-SPM-GRJ

Accordingly, Plaintiff's false payment claim for fraudulent upcoding under subsection (a)(2) is pleaded with particularity based on charts 2, 5, 6, and 7. For his false presentment claim for fraudulent upcoding under subsection (a)(1), Plaintiff has alleged fraud with particularity based on all sixteen patient charts.

## C. Place of Service

Plaintiff's second allegation of fraud concerns false place of service claims. Plaintiff provides three specific examples of his visits to the nursing home being billed under the out-patient clinic. Plaintiff has attached some records, but they are difficult to read. It is not apparent from the records how these claims were submitted, when the claims were submitted, and to whom these claims were submitted.

Plaintiff alleges, however, that Carol (last name not provided) operated the out-patient clinic and advised Plaintiff that all nursing home visits were billed as hospital out-patient visits. Plaintiff also attached a compensation sheet to support his allegations of false place of service claims. Regarding this sheet, Plaintiff alleges that Alan Bird explained that no nursing home visits were recorded on the compensation sheet because they were incorporated into out-patient clinic visits. Most importantly, Plaintiff alleges specific billing dates and payment amounts for all three examples. These details are sufficient to meet the heightened pleading standard.

### D. Churning

Plaintiff's final allegation of fraudulent churning is supported only by the allegation that he was berated by Alan Bird for not fraudulently churning patients. Plaintiff alleges that Bird then explained the "business plan" for why and how churning should occur. However, although Plaintiff alleges he was told the particulars of the fraudulent scheme, Plaintiff again fails to include the details of any falsely submitted claims for payment based on this scheme. Standing alone, allegations of an improper billing scheme, which may result in the submission of false claims, is not enough to satisfy Rule 9(b). See United States ex rel. Hopper v. Solvay Pharm., Inc. 590 F. Supp. 2d 1352, 1359 (M.D. Fla. 2008) (finding that it is not the law of the Eleventh Circuit that allegations of false or fraudulent claims "from which it can be inferred that a false claim was submitted to government" satisfy Rule 9(b)'s pleading with particularity requirement), aff'd 588 F.3d 1318 (2009), cert. denied 130 S. Ct. 3465 (2010). Since Plaintiff has failed to allege the particulars of any claim falsely submitted or paid under this scheme of fraudulently churning patients, Plaintiff has failed to adequately plead fraudulent churning as required by Rule 9(b).

### E. Liability of "New Owners"

On September 15, 2010, one hundred percent of Cypress Florida's stock was transferred from Kim B. Bird and Tony L. Pfaff to Mid Florida Healthcare Holdings, Inc. and Jerry E. Gillam, as president. Since all of the specific

Case No. 1:09cv137-SPM-GRJ

incidents of alleged fraud occurred before the September 15, 2010 transfer, Cypress Florida argues that as a "new owner," it cannot be held liable for alleged fraud that occurred by a prior owner.

This argument fails because the "new owner" provisions of the Medicare Financial Management Manual that Cypress Florida relies on are only applicable when a facility undergoes a change of ownership. See doc. 99-5, Medicare Financial Management Manual, Ch. 3, section 130. Under the governing federal regulations, a transfer of corporate stock does not constitute a change of ownership. 42 C.F.R. § 498.18(a)(3). Accordingly, the sale of corporate stock does not affect Cypress Florida's liability under the Federal False Claims Act because there was no change in ownership to make Cypress Florida a "new owner."

Cypress Florida cites to the analogous provision of the Florida Statutes, § 409.901(5)(b), Fla. Stat., which defines change of ownership to include any event in which 51 percent or more of corporate shares are transferred or assigned. However, the federal law takes precedence, at least as to the federal False Claims Act claims. See United States v. Vernon Home Health, Inc., 21 F.3d 693, 695 (5th Cir. 1994) (federal regulations regarding medical provider agreement preempts contrary state corporate law). The Florida Statute cannot apply to absolve Cypress Florida of its federal liability.

As for the Florida False Claims Act, Cypress Florida does not develop an

argument concerning its liability after a change in ownership under Florida law. With the exception of § 409.901(5)(b), Fla. Stat., Cypress Florida only cites to federal regulations and case law regarding "new owners." Cypress Florida cites to no Florida law that governs liability for fraud that occurred before a change of ownership. Cypress Florida makes no attempt to argue that its liability under the Florida False Claims Act is different from its liability under the Federal False Claims Act. Accordingly, the Court will not speculate whether the differences between the change of ownership provisions in the federal regulations and the Florida law result in a different result for Cypress Florida's liability under the Florida False Claims Act.

### III.  CONCLUSION

The allegations in Plaintiff's amended complaint are sufficient to state fraud with particularity for false upcoding based on the sixteen patient charts (which support Count I for false presentment under subsection (a)(1)) and chart numbers 2, 5, 6, and 7 (which support Count II for false payment under subsection (a)(2)). For his claims based on false place of service, Plaintiff alleges specific billing dates and payment amounts for three examples to state with particularity his claims for false presentment and false payment. For his claims based on fraudulent churning, Plaintiff's allegations of a false billing scheme do not include details about the submission of fraudulent claims or payment of fraudulent claims so as to plead fraud with particularity. Finally,

Cypress Florida has not demonstrated that it cannot be held liable for fraud that occurred before the sale of stock.  Based on the foregoing, it is

ORDERED AND ADJUDGED:

1. Defendant Cypress Health Systems Florida, Inc.'s Motion to Dismiss Amended Complaint (doc. 99), as joined by Defendant Alan Bird (doc. 106), is granted in part and denied in part.

2. Plaintiff may proceed on his claims based on upcoding and false place of service, as provided in this order.

DONE AND ORDERED this 14th day of February, 2012.

*s/ Stephan P. Mickle*
Stephan P. Mickle
Senior United States District Judge